

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2017**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 16-31488-sgj-7** |
| **BILLY DEAN HUDDLESTON, JR.,** | § | **(Chapter 7)** |
| Debtor | § | |

| | | |
|---|---|---|
| **FORT APACHE ENERGY, INC.,** | § | |
| Plaintiff | § | **ADVERSARY NO. 16-03130-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **BILLY DEAN HUDDLESTON, JR.,** | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT: (A) ESTABLISHING A DEBT; AND (B) EXCEPTING IT FROM DISCHARGE, PURSUANT TO SECTION 523(a)(2)(A)

CAME ON FOR TRIAL on February 21-22, 2017, the above-referenced Adversary

Proceeding (herein so called) filed by Fort Apache Energy, Inc. (the "Plaintiff" or "Fort Apache"),

in which Plaintiff objected to the dischargeability of a debt allegedly owed to it by the Chapter 7

debtor, pursuant to section 523(a)(2)(A) or (6) of the Bankruptcy Code. The court has determined

that Fort Apache has established a nondischargeable debt, pursuant to section 523(a)(2)(A) of the Bankruptcy Code, as further set forth herein. The court issues these Findings of Fact and Conclusions of Law in support of this decision, pursuant to Fed. R. Bankr. Pro. 7052. Any Finding of Fact that should more properly be characterized as a Conclusion of Law should be deemed as such, and *vice versa*.

## I. FINDINGS OF FACT

1. The Chapter 7 Debtor, Billy Dean Huddleston, Jr. (the "Debtor" or "Mr. Huddleston"), was the sole, managing member of an entity known as Huddleston Exploration LLC ("Huddleston Exploration"). Mr. Huddleston and Huddleston Exploration were involved in oil and gas exploration endeavors for many years. Despite its name, Huddleston Exploration was not an exploration and production company *per se*. It was not an operator. Rather, it was mostly engaged in the business of raising capital from investors for oil and gas drilling projects. Specifically, it would typically solicit investors who would pay money to receive either fractional, participations in nonworking interests or various other types of interests in drilling projects. The documentation and exact details for these investments—from investor to investor—were often inconsistent and confusing.[1]

2. This Adversary Proceeding involves the time span between early 2012 and late 2014, and one certain oil and gas well on some acreage known as the Ramos field in Assumption Parish, Louisiana—which was sometimes referred to as the "Williams #1 Well" (the "Well"). The Well was initially drilled in 2001 and while it performed favorably for a period of time, it soon started producing water at higher and higher levels and production was eventually stopped.[2] The

---

[1] *See, e.g.*, Trial Transcript (2/22/2017) pgs. 93-95 [DE # 31].

[2] *See* Fort Apache Exhibit 1.

Well was re-entered a couple of times at different depths, with different operators assuming operations at different times. Eventually, drilling on the Well was completely stopped. In March 2012, Huddleston Exploration acquired a lease on the acreage surrounding the Well and decided to solicit interest for a "re-entry" of the Well.

### A. June 2012: Execution of the Joint Operating Agreement and the Participation Agreement.

3. Shortly after March 2012, Huddleston Exploration, through Mr. Huddleston, approached oil and gas operator Fort Apache and its president, Allan Bloxsom ("Mr. Bloxsom"), regarding the possibility of re-entering the Well with new techniques. Mr. Huddleston had been involved with Fort Apache on a few other projects in the past.[3] On June 11, 2012, Huddleston Exploration and Fort Apache executed a Joint Operating Agreement (the "JOA") and Participation Agreement (the "PA") with regard to the Well.[4] These agreements obligated Huddleston Exploration to contribute 90% of the drilling and completion costs for a 90% working interest in the Well, with Fort Apache to be the operator and receive a 10% working interest.[5] An Authorization for Expenditure (the "AFE") that Fort Apache provided to Huddleston Exploration prior to the JOA being signed estimated costs to be incurred on the Well at: (a) $5,802,000 for both intangible drilling costs and tangible equipment—keeping in mind that this was a workover on a previously drilled well (as to which Fort Apache would eventually come in $100,000 under budget); and (b) $1,417,550 for completion of the Well, if the Well (after testing) was determined

---

[3] *See* Trial Transcript (2/22/2017) pg. 48 [DE # 31].

[4] *See* Fort Apache Exhibits 4 & 5. An "Assignment, Bill of Sale and Conveyance" was also executed by Huddleston Exploration and Fort Apache on June 4, 2012, whereby Mr. Huddleston (on behalf of Huddleston Exploration) assigned his interest in the Well and certain personal property and equipment to Fort Apache. *See* Fort Apache Exhibit 3.

[5] *See* Fort Apache Exhibits 4 & 5.

to be capable of producing.[6] The AFE represented that the total cost of the Well would be $7,219,550. Using simple math, Huddleston Exploration's 90% share of these costs was expected to be $5,221,800 for the initial intangible and tangible costs of getting the Well ready (90% times $5,802,000), and then another $1,275,795 to get to completion (90% times $1,417,550)—for a total of $6,497,595. Again, the AFE was provided to Mr. Huddleston prior to Huddleston Exploration's execution of the JOA and PA.[7]

### B. June 2012-May 2014: Huddleston Exploration Fails to Pay Amounts for Which it is Obligated Under the JOA and the PA.

4. Although Huddleston Exploration was originally obligated to contribute 90% of the drilling and completion costs for the Well, as of November 1, 2012—when drilling was supposed to begin per the PA—Huddleston Exploration had not contributed any funds at all to Fort Apache.[8] To be clear, after the JOA and PA were entered into on June 11, 2012, Fort Apache began performing various remediation work and other tasks to get the Well site ready for drilling. Fort Apache did this without any contributions being made by Huddleston Exploration. Then, on October 2, 2012, Fort Apache sent a letter to Huddleston Exploration stating that it had gotten the site ready for bringing in a drilling rig, and it needed the AFE funds—adding, "[w]e can start operations with the workover rig within 10 days of funding."[9] Mr. Bloxsom credibly testified that Mr. Huddleston represented to Mr. Bloxsom that he was having trouble raising funds from his investors. As a result, Mr. Bloxsom did not bring a rig on to the Well site at this time.[10]

---

[6] *See* Fort Apache Exhibit 2.

[7] *See* Trial Transcript (2/21/2017) pgs. 37-40 [DE # 30] & Trial Transcript (2/22/2017) pgs. 122-123 [DE # 31].

[8] *See* Fort Apache Exhibit 5 ¶¶ 3.1-3.2. *See also* Trial Transcript (2/21/2017) pgs. 33, 40-41 [DE # 30].

[9] *See* Fort Apache Exhibit 6.

[10] *See* Trial Transcript (2/22/2017) pgs. 36-37 [DE # 31].

5.      In December 2012, Huddleston Exploration finally sent Fort Apache a $25,000 payment for a lease extension (its very first contribution toward the Well project).[11] However, the evidence presented demonstrated that, in fact, Mr. Huddleston had already raised $725,000 in funds from investors for the Well project, by the end of 2012, unbeknownst to Fort Apache.[12] Mr. Bloxsom credibly testified that he was shocked when he later discovered this.[13] It was wholly inconsistent with what Mr. Huddleston was representing.

6.      Huddleston Exploration then sent two additional $25,000 checks to Fort Apache between January 2013 and March 2013.[14]

7.      On March 19, 2013, Fort Apache sent Huddleston Exploration a cash call letter with regard to the Well.[15] The letter, sent by Apache's Chief Financial Officer, Matt Milligan ("Mr. Milligan"), requested that Huddleston Exploration forward its proportionate share of funds relating to the Well project, which at this time was $3,238,276. The letter requested the money by March 31, 2013. Nothing was forthcoming from Huddleston Exploration by that date.

8.      It was at this point in time that the documentary evidence in this Adversary Proceeding, as well as the credible testimony of Mr. Bloxsom and Mr. Milligan, reflected a growing sense of frustration with Mr. Huddleston. For example, an email from Mr. Bloxsom to Mr. Huddleston, dated April 30, 2013, states: "[y]ou already received the Cash Calls for the [Well project]. Those funds need to be in within the next 5 working days. . . . I must stress to you how

---

[11] *See* Fort Apache Exhibit 22 (General Ledger of Huddleston Exploration) & Debtor Exhibit J. *See also* Transcript (2/21/2017) pgs. 40-41, 144 [DE # 30] & Trial Transcript (2/22/2017) pg. 36 [DE # 31].

[12] *See* Trial Transcript (2/21/2017) pg. 110 [DE # 30] & Trial Transcript (2/22/2017) pg. 36 [DE # 31].

[13] *See* Trial Transcript (2/22/2017) pg. 65 [DE # 31].

[14] *See* Fort Apache Exhibit 22 & Debtor Exhibit J.

[15] *See* Fort Apache Exhibit 7.

important it is that your funds be in before the workover rig is on location, but we are aiming for the funds to be in within the next 5 working days."[16]  Moreover, Mr. Bloxsom credibly testified that Mr. Huddleston would, again and again during this time period, state that he had not been able to raise the investor money.[17]  This was putting Mr. Bloxsom in an awkward position because he would have a rig lined up to move onto the Well site, and would then have to decline it and let it go out to other jobs.[18]  Moreover, this increasing sense of frustration and angst with Mr. Huddleston seems reasonable because, by late summer 2013, Huddleston Exploration had only sent Fort Apache $517,500 (through September 3, 2013)—which was well over a year after the JOA and PA were signed and long after Fort Apache had started demanding the $3,238,275.[19]

9.      Meanwhile, unbeknownst to Fort Apache (and, in fact, contrary to what Mr. Huddleston was telling Fort Apache), Mr. Huddleston had been soliciting and receiving investments for the Well as early as July 2012[20] and, instead of sending these investment funds to Fort Apache, Mr. Huddleston was using the funds for other purposes, mostly personal.  The evidence was clear that a significant amount of the investor funds that Huddleston Exploration raised were spent by Mr. Huddleston on casino gambling.[21]

10.     And Mr. Huddleston's gambling losses were significant before, during, and after his dealings with Fort Apache regarding the Well.  As demonstrated by Mr. Huddleston's personal

---

[16] *See* Fort Apache Exhibit 8.

[17] *See* Trial Transcript (2/22/2017) pgs. 37-38 [DE # 31].

[18] *See* Trial Transcript (2/22/2017) pgs. 124-25, 128-29 [DE # 31].

[19] *See* also Plaintiff's Exhibit 22 (reflecting a total of $492,500, as the Huddleston Exploration general ledger had not taken into account the $25,000 payment for the lease extension).

[20] *See* Fort Apache Exhibit 31.

[21] *See* Trial Transcript (2/21/2017) pgs. 121-22 [DE # 30].

tax returns, Mr. Huddleston had "gambling losses" of approximately $870,000 in 2011, $611,000 in 2012, $619,000 in 2013, $499,000 in 2014, and $746,000 in 2015.[22] There was also a matching deduction against "gambling winnings" in the same amounts. However, as Mr. Milligan testified, "the IRS allows you to take gambling losses up to the amount of your winnings. They don't allow you to deduct against your taxes, gambling losses against your ordinary income. And so I'm assuming—well, I look here and I see that his gambling winnings was $3.3 million and his gambling losses is [sic] up to the extent of the winnings. And so to me there's actually—there's more additional losses on top of what's reflected on his tax return . . . it could have been a dollar more, it could have been millions more, we don't know."[23]

11. Fort Apache presented credible evidence (which Mr. Huddleston confirmed through his own testimony) showing that, after investor funds designated for the Well were deposited into Huddleston Exploration's general operating account, Mr. Huddleston would subsequently write checks to himself or transfer funds from Huddleston Exploration's accounts into his own personal bank account.[24] Moreover, the evidence also showed a pattern where the balance in Huddleston Exploration's general operating account[25] would balloon throughout the

---

[22] See Trial Transcript (2/21/2017) pg. 21 [DE # 30]. See also Fort Apache Exhibits 27A-27E.

[23] See Trial Transcript (2/21/2017) pg. 115 [DE # 30].

[24] See Fort Apache Exhibit 34 & Trial Transcript (2/21/2017) pg. 167 [DE # 30].

[25] Mr. Milligan credibly testified about two accounts utilized by Mr. Huddleston for Huddleston Exploration. Specifically, Huddleston Exploration maintained two accounts and both accounts appeared to be maintained in the same fashion, with investments for the Well going into both accounts and with payments to Fort Apache going out of both accounts. Meanwhile, operating bills, administrative expenses, and personal expenses were also being paid out of these accounts. In other words, the evidence demonstrated (and Mr. Huddleston did not dispute) that Mr. Huddleston commingled business and personal funds in the Huddleston Exploration bank accounts. See Trial Transcript (2/21/2017) pgs. 167-68 [DE # 30]. However, the majority of the investor funds for the Well and checks to Fort Apache (approximately 95%, according to the credible testimony of Mr. Milligan) flowed in and out of the Huddleston Exploration general operating account, account ending in "3156". See Trial Transcript (2/21/2017) pg. 129 [DE # 30]. The other Huddleston Exploration account (ending in "3222") reflected deposits of $537,000 of investor contributions for the Well and $366,750 in checks written to Fort Apache. See Fort Apache Exhibit 34 & Trial Transcript (2/21/2017) pg. 99 [DE # 30].

month and then come down to nearly zero by the end of the month, with transfers being made into Mr. Huddleston's personal bank account as well as transfers coming back from Mr. Huddleston's personal bank account to the general operating account to meet temporary cash needs.[26] The totality of the evidence showed that Mr. Huddleston withdrew approximately $2.8 million from Huddleston Exploration's general operating account between January 2012 and January 2015 to pay for his own personal expenses, all the while telling Fort Apache that he was unable to raise funds to cover Huddleston Exploration's agreed 90% working interest in the Well.[27]

12.     While the paper trail in this Adversary Proceeding is sometimes difficult to follow, the credible testimony and documentation reflects that, by summer 2013, Mr. Bloxsom and Mr. Huddleston were discussing a reduction of Huddleston Exploration's working interest, due to Mr. Huddleston's representations that he was having trouble raising funds to pay for the 90% working interest.[28] A July 26, 2013 email exchange reflects this, and also reflects that Mr. Huddleston was conjecturing that, by his estimations, he would need to send $2,702,000 to Fort Apache right away and anywhere from another $1.4 million to $1.7 million for ultimate completion of the Well.[29] Mr. Bloxsom replied to this email (disputing some of Mr. Huddleston's statements) and stated that he needed $3.5 million for drilling and testing at a minimum, but "[w]e can start with the $2.7mm."[30]

---

[26] See Trial Transcript (2/21/2017) pgs. 49, 129-32 [DE # 30].

[27] See Fort Apache Exhibit 34. See also Trial Transcript (2/21/2017) pgs. 58, 132 [DE # 30]. Moreover, the evidence showed that Mr. Huddleston did not report the more than $2 million of investor funds that he spent on either Huddleston Exploration's tax returns or on his individual tax returns. See Fort Apache Exhibit 26A, 26B, 26C, 26D, 27A, 27B, 27C, 27D, 27E & 33. In any event, Fort Apache presented evidence that Mr. Huddleston sent "tax statements" to his investors summarizing how their investments should be reported for tax purposes without including a line item for Mr. Huddleston's profit or disclosing how much of their investment was for his own personal profit. See Fort Apache Exhibit 24.

[28] See Trial Transcript (2/22/2017) pg. 34 [DE # 31].

[29] See Fort Apache Exhibit 9.

[30] Id.

13.     Subsequent to this email exchange, Mr. Huddleston, after much prodding from Mr. Bloxsom, finally sent in a $137,000 payment around August 13, 2013, that was used by Fort Apache to pay for some work over/remediation work on the Well. [31]   The $137,000 payment was substantially less than what had previously been requested by Mr. Milligan and Mr. Bloxsom.  As a result, on September 16, 2013, Mr. Bloxsom sent Mr. Huddleston an email that was one sentence in length:  "[y]ou need to have $1.4 mm here this week or all hell is going to break loose."[32]

14.     The evidence reflects that Huddleston Exploration then started sending in more substantial payments[33] following this email (*e.g.,* $274,000 in October 2013 and $602,700 in February 2014),[34] but all the while, Mr. Huddleston was still repeatedly telling Mr. Bloxsom that he needed more time to raise sufficient investor funds.  The evidence also reflects that on occasion, Mr. Huddleston would send in checks and ask Fort Apache to hold off on depositing them.[35]

15.     On May 9, 2014, Mr. Milligan (at Mr. Bloxsom's instruction) sent an email to Mr. Huddleston, stating that the drilling rig was on location and attaching a cash call for $1,444,076,

---

[31] *See* Trial Transcript (2/22/2017) pgs. 126-28 [DE # 31].  *See also* Debtor Exhibit J.

[32] *See* Fort Apache Exhibit 10.

[33] The court finds that there was a lack of credible testimony from Mr. Huddleston explaining why the payments were so sporadic.  Specifically, Mr. Huddleston testified that he would send money when asked personally by Mr. Bloxsom (not based upon invoices or emails he was receiving), and that he was also not sending in a large amount of funds at one time because the amounts requested "were always changing" (*i.e.*, the Well costs were going up).  However, the court did not find this explanation of Mr. Huddleston to be credible and, as stated by Mr. Bloxsom, appears to be a "bunch of hog wash."  First, the evidence reflects that Mr. Huddleston had received multiple invoices as well as emails from Fort Apache between 2013 and 2014, reflecting large amounts due on the Well.  Moreover, as to the "changing amounts" testimony, the evidence reflects that Mr. Huddleston was provided with the AFE prior to signing the JOA and the PA, and that Fort Apache was actually $100,000 ***under*** budget on the Well when all was said and done.  *See* Trial Transcript (2/22/2017) pgs. 105-116, 122-23, 126-27 [DE # 31].

[34] *See* Fort Apache Exhibit 22 & Debtor Exhibit J.

[35] *See* Fort Apache Exhibit 11.  *See also* Trial Transcript (2/21/2017) pgs. 45, 126-27 [DE # 30], Trial Transcript (2/22/2017) pg. 101 [DE # 31] & Fort Apache Exhibit 31.

indicating that such funds were needed within 48 hours.[36] Per the attached cash call, Huddleston Exploration had only sent Fort Apache $1,794,200 as of May 9, 2014. However, the credible evidence indicated that Mr. Huddleston had raised approximately $3,128,125 of investor funds for the Well by that point in time.[37] Moreover, the credible evidence demonstrated that Mr. Huddleston had made approximately $1.5 million in transfers to himself from funds that were in Huddleston Exploration's general operating account.[38] Both Mr. Milligan and Mr. Bloxsom testified that they were unaware that Mr. Huddleston had raised over $1,000,000 more than what had been received by Fort Apache.[39] Mr. Huddleston consistently represented he was having trouble raising money for the Well.

16. By the end of May 2014, Fort Apache completed drilling on the Well.[40] At that point in time, Huddleston Exploration was still well short of contributing its share of the drilling costs. Again, Mr. Huddleston represented that he needed more time to raise the necessary funds.[41]

**C.** **June 2014: Execution of the June 2014 Agreement.**

17. On June 17, 2014, Mr. Huddleston signed a supplemental agreement with Fort Apache (the "June 2014 Agreement").[42] The June 2014 Agreement was drafted by an employee

---

[36] *See* Fort Apache Exhibit 12 & Trial Transcript (2/21/2017) pgs. 66-67 [DE # 30] & Trial Transcript (2/22/2017) pg. 40 [DE # 31]. Mr. Milligan credibly testified that, typically drilling funds are due within 48 hours of the rig being onsite, so that an operator can pay the vendors. *See* Trial Transcript (2/21/2017) pgs. 34-35 [DE # 30].

[37] *See* Trial Transcript (2/21/2017) pg. 67 [DE # 30]. Note, this is somewhat contradictory to Debtor Exhibit J, which reflects receipts of $1,894,200. *See also* Fort Apache Exhibit 34.

[38] *See* Fort Apache Exhibit 34 & Trial Transcript (2/21/2017) pg. 68 [DE # 30].

[39] *See* Trial Transcript (2/21/2017) pg. 67 [DE # 30] & Trial Transcript (2/22/2017) pg. 40 [DE # 31]. *See also* DE # 34.

[40] *See* Trial Transcript (2/21/2017) pg. 87 [DE # 30].

[41] *See* Trial Transcript (2/21/2017) pg. 86 [DE # 30].

[42] *See* Fort Apache Exhibit 13.

of Huddleston Exploration named Tony McGinty.[43]   Tony McGinty is no longer alive to potentially testify about the June 2014 Agreement.  Tragically, sometime in mid-2016 (in between the first scheduled Section 341 meeting of creditors and a second scheduled Section 341 meeting of creditors), Tony McGinty fell to his death from a high rise balcony.  The June 2014 Agreement, signed by Mr. Huddleston and Mr. Bloxsom, stated that Huddleston Exploration had thus far paid for a 45% working interest in the Well.  It further provided that Huddleston Exploration would be responsible for funding an additional 20% working interest, and that Mr. Huddleston was "***personally*** responsible for payment to Fort Apache Energy Inc. of $1,400,000 for said 20% working interest."[44]   The court finds that this June 2014 Agreement revised the original deal outlined in the JOA and PA in two respects:  (a) Huddleston Exploration was now committed to only funding a 65% working interest in the Well (as opposed to the original 90% commitment);[45] and (b) now Mr. Huddleston was committing to be personally responsible for $1.4 million of the remaining obligations of Huddleston Exploration.  This $1.4 million amount appears from the evidence to have been an amount that Fort Apache needed right away to apply toward the remaining drilling and completion costs (not necessarily all of the amount that Huddleston

---

[43] *See* Trial Transcript (2/22/2017) pgs. 92-93 [DE # 31].

[44] Fort Apache Exhibit 13 (emphasis added).  Mr. Bloxsom credibly testified that, prior to the execution of the June 2014 Agreement, he had thought that he had found an investor to purchase a 20% interest in the Well.  However, that deal ultimately fell through, which initiated the need for the June 2014 Agreement.  *See* Trial Transcript (2/22/2017) pgs. 68-69 [DE # 31].

[45] *See* Trial Transcript (2/22/2017) pgs. 67-68 [DE # 31].  There was testimony that Mr. Bloxsom gave Huddleston Exploration an additional 2% working interest as part of the June 2014 Agreement, raising Huddleston Exploration's interest in the well to 67%.  However, the paper trail is imprecise on this point.  In any event, the weight of the evidence does seem to suggest that Huddleston Exploration had, at the least, an obligation as of June 2014 to cover costs for a 65% interest in the Well, and if such costs were covered, it would have been entitled to a 67% interest in the Well.  *See* Trial Transcript (2/21/2017) pg. 43 [DE # 30] & Fort Apache Exhibit 35 & Trial Transcript (2/22/2017) pgs. 52-55 [DE # 31].

Exploration would ultimately owe towards its now-65% commitment), but—in any event—Mr. Huddleston agreed to be personally responsible for this $1.4 million amount.[46]

18. A copy of the executed June 2014 Agreement was forwarded to Mr. Huddleston by Mr. Milligan on June 25, 2014.[47] The court notes that the June 2014 Agreement does not reflect a date by which the $1.4 million had to be paid to Fort Apache. However, Mr. Bloxsom credibly testified that Mr. Huddleston said he could pay it within 30 days.[48]

19. Importantly, at the time that Mr. Huddleston executed the June 2014 Agreement, the evidence from Huddleston Exploration's general operating account showed that it had raised approximately $4 million in investor funds for the Well, but had only sent Fort Apache approximately $2 million.[49] Mr. Milligan and Mr. Bloxsom both credibly testified that Mr. Huddleston continued to convey to them that he was having trouble raising the necessary funds.[50] Moreover, Mr. Bloxsom credibly testified that, if he had known how much Mr. Huddleston had raised and ***not*** sent to Fort Apache, he would have cancelled the whole project and taken his losses with the drilling company.[51]

---

[46] *See* Trial Transcript (2/21/2017) pg. 84 [DE # 30] & Trial Transcript (2/22/2017) pg. 69 [DE # 31]. The evidence reflects that as of June 16, 2014, Fort Apache had received $2,797,950 in funds from Huddleston Exploration. *See* Debtor Exhibit J. This would include checks written out of both of the Huddleston Exploration bank accounts.

[47] *See* Fort Apache Exhibit 14.

[48] *See* Fort Apache Exhibit 13 & Trial Transcript (2/22/2017) pg. 41 [DE # 31]. Mr. Huddleston testified that he believed that the June 2014 Agreement was contingent on the Well actually flowing. However, the court did not find such testimony credible. Moreover, this interpretation was plainly contradictory to the actual terms set forth in the June 2014 Agreement which Mr. Huddleston signed. *See, e.g.*, Trial Transcript (2/21/2017) pgs. 87, 90, 186-87, 198 [DE # 30] & Trial Transcript (2/22/2017) pg. 42, 62, 91-92 [DE # 31].

[49] *See* Fort Apache Exhibit 34 & Trial Transcript (2/21/2017) pg. 86 [DE # 30].

[50] *See* Trial Transcript (2/21/2017) pg. 86 & Trial Transcript (2/22/2017) pgs. 41-42 [DE # 31].

[51] *See* Trial Transcript (2/22/2017) pg. 70 [DE # 31].

20.     Mr. Bloxsom credibly testified that, around the time the June 2014 Agreement was executed, Mr. Huddleston told him that "once we get the rig out there, there's not going to be any problem.  I'll get the rest of this funded. . . . you'll have your money before we get down to TD, total depth, before the well is finished."[52]

21.     On August 22, 2014, Mr. Milligan sent an email to Mr. Huddleston reminding him that he still owed Fort Apache $1,330,000 under the June 2014 Agreement.[53]  In other words, two months after execution of the June 2014 Agreement, Huddleston Exploration had only sent Fort Apache $70,000 of the $1.4 million compromised amount that Mr. Huddleston had stated he could pay within thirty (30) days.  Mr. Milligan credibly testified that Mr. Huddleston called him after he sent the email, stating that he needed to discuss the issue with Mr. Bloxsom.  Mr. Milligan implicitly understood from the conversation that Mr. Huddleston was (once again) having a tough time raising capital.[54]  What Fort Apache did not realize, at that point in time, was that Huddleston Exploration had actually raised another $322,455 toward the Well, subsequent to its execution of the June 2014 Agreement, and instead of forwarding all of such funds to Fort Apache, Mr. Huddleston used the money for other purposes.[55]

D.     *October 2014: Execution of the "Napkin Agreement."*

22.     By the beginning of October 2014 (and with testing on the Well having begun around October 10, 2014),[56] Huddleston Exploration and Mr. Huddleston (recall that Mr.

---

[52] See Trial Transcript (2/22/2017) pg. 69 [DE # 31].

[53] *See* Fort Apache Exhibit 15.  Specifically, Huddleston Exploration made a $50,000 payment and a $20,000 payment to Fort Apache in July 2014.

[54] *See* Trial Transcript (2/21/2017) pgs. 89-90 [DE # 30].

[55] *See* Fort Apache Exhibit 34.

[56] *See* Trial Transcript (2/21/2017) pg. 153 [DE # 30] & Trial Transcript (2/22/2017) pgs. 60, 85 [DE # 31].

Huddleston was now contractually, personally obligated) had still failed to pay any of the remaining $1,330,000 owed under the June 2014 Agreement. As a result, Mr. Huddleston executed a payment agreement with Fort Apache that set forth specific deadlines by which he had to pay amounts still owed under the June 2014 Agreement. This agreement, dated October 16, 2014, and referred to by the parties as the "Napkin Agreement," set forth the following deadlines:

> 35% Paid
> 67%-Oct 17th $200,000
>            Oct 31st $300,000        7.875%
>
> Nov 30th-$500,000 – 7.875%
> Balance -$400,000 – 6.25%
> Completion -at cost-
> Supplemental Cash Call on 22%[57]

Mr. Milligan, Mr. Bloxsom, and Mr. Huddleston were all present when the Napkin Agreement was negotiated and executed at Mr. Bloxsom's offices.[58]

23. At the time Mr. Huddleston executed the Napkin Agreement, he already had received sufficient investor funds to meet some of his obligations under the June 2014 Agreement. Specifically, between the time the June 2014 Agreement was executed and the Napkin Agreement was executed (June 17, 2014 through October 16, 2014), Mr. Huddleston had raised $532,455 and only sent Fort Apache $70,000.[59] Once again, Mr. Bloxsom credibly testified that, had he known Huddleston Exploration had raised (and spent for Mr. Huddleston's own purposes) $2,000,000 more than what it had paid to Fort Apache, since the deal was first entered into in 2012, Mr. Bloxsom would never have executed the Napkin Agreement.[60]

---

[57] See Fort Apache Exhibit 16.

[58] See Trial Transcript (2/22/2017) pg. 59 [DE # 31].

[59] See Fort Apache Exhibit 34.

[60] See Trial Transcript (2/22/2017) pgs. 45-46 [DE # 31].

24.     After executing the Napkin Agreement, Mr. Huddleston remitted two $100,000 checks to Mr. Milligan.[61]  After receiving them, Mr. Milligan sent an email to Mr. Huddleston (the next day) asking if he could deposit the checks.  Mr. Huddleston replied that there would be funds to cover the checks in his account that day, so it was okay to deposit the checks.[62]  This had apparently become normal operating procedure for Mr. Milligan to check with Mr. Huddleston before depositing any checks from him.[63]  After sending both checks to Fort Apache's bank for deposit, Mr. Milligan was informed by the bank that one of the checks came back unapproved. Mr. Milligan later found out from Mr. Huddleston that Mr. Huddleston had put a stop payment on one of the $100,000 checks and that another $125,000 payment would be coming directly from one of Mr. Huddleston's investors, ELSR.  This check from ELSR (the last payment sent to Fort Apache) was received on October 23, 2014.[64]

25.     On October 31, 2014, Mr. Milligan emailed Mr. Huddleston to follow up on receiving the remaining $275,000 that was due at that point in time under the Napkin Agreement ($500,000 was due by October 31, 2014 and $225,000 had been received).  Mr. Milligan mentioned that he was holding a $75,000 check and a $100,000 check, and asked if he could deposit those checks or not.  Moreover, he asked Mr. Huddleston if he needed wiring instructions to send the remaining amounts due.[65]

---

[61] *See* Trial Transcript (2/21/2017) pg. 94 [DE # 30].

[62] *See* Fort Apache Exhibit 17.

[63] *See* Trial Transcript (2/21/2017) pg. 94 [DE # 30].

[64] *Id.* at 96-97.  *See also* Debtor's Exhibit J & Fort Apache Exhibit 22.

[65] *See* Fort Apache Exhibit 18.

26.     Mr. Huddleston did not reply to Mr. Mulligan's email and ultimately defaulted on his obligation to pay Fort Apache $1.4 million in accordance with the schedule set forth in the Napkin Agreement.  On November 4, 2014, Fort Apache (through counsel) sent a notice of default to Mr. Huddleston and Huddleston Exploration referencing the JOA, the PA, the June 2014 Agreement, and the Napkin Agreement.[66]

27.     Based on all of the credible evidence, the court finds that, between June 2012 and November 2014, although Mr. Huddleston, through Huddleston Exploration, raised approximately $5.2 million of investments for the Well, Huddleston Exploration only contributed approximately $3 million to Fort Apache to cover the drilling and completion costs of the Well.  Mr. Huddleston retained approximately $2.1 million of the investor funds, and Fort Apache was not aware of this fact.[67]  Specifically, the court finds that Mr. Huddleston caused Huddleston Exploration to fail to pay Fort Apache $2,061,847.56 for the drilling and completion of the Well (with completion occurring in February 2015).[68]  The court again notes that the total cost of the project was $100,000 less than what was originally budgeted in the AFE dated April 25, 2012.[69]  All during this time frame, the evidence is undisputed, that Mr. Huddleston was transferring money in and out of Huddleston Exploration's two bank accounts—in and out of his own personal bank account—and racking up hundreds of thousands of dollars of gambling debt.

28.     Mr. Huddleston never disclosed to Fort Apache that he had raised over $5 million for the Well, and repeatedly represented to Fort Apache that he needed more time to raise sufficient

---

[66] *See* Fort Apache Exhibit 19.  *See also* Trial Transcript (2/21/2017) pg. 35 [DE # 30].

[67] *See* Fort Apache Exhibits 31 & 35 & Trial Transcript (2/21/2017) pgs. 108, 177-78 [DE # 30].

[68] *See* Fort Apache Exhibit 35 & Trial Transcript (2/21/2017) pgs. 54, 56, 135-36 [DE # 30].

[69] *See* Trial Transcript (2/21/2017) pg. 40 [DE # 30].

funds.[70]   Additionally, Mr. Bloxsom credibly testified that he relied on Mr. Huddleston's representations that Huddleston Exploration would meet its payment obligations and that he needed more time.  The court believes the testimony of Mr. Bloxsom that, had Fort Apache known the funds had been raised and were being spent on other purposes, he would have discontinued the Well project.[71]

### E.   November 2014-Present: The State Court Lawsuit and Subsequent Bankruptcy Filings.

29.   On November 7, 2014, Fort Apache brought suit against Huddleston Exploration in Kendall County, Texas (the "State Court Lawsuit"), initially seeking forfeiture of Huddleston Exploration's interest in the Well pursuant to section 15.K of the JOA.[72]  The State Court Lawsuit was subsequently amended by Fort Apache to include claims against Mr. Huddleston personally as well as to modify its request for forfeiture of Huddleston Exploration's interest in the Well to a claim for monetary damages (*i.e.*, amounts owed under the JOA, the PA, the June 2014 Agreement, and the Napkin Agreement).[73]   Mr. Huddleston and Huddleston Exploration also filed counterclaims against Fort Apache, Mr. Bloxsom, and Drilling Risk Management, Inc. in the State Court Lawsuit.[74]

30.   The Well was finally completed and began flowing in February 2015.[75]

---

[70] *See* Trial Transcript (2/21/2017) pgs. 138-39 [DE # 30].

[71] *See* Trial Transcript (2/22/2017) pgs. 38, 46 [DE # 31].  More specifically, Mr. Bloxsom credibly testified that had he known that Mr. Huddleston had raised sufficient funds to cover what he owed under the various agreements, he would "have dropped this deal like a hot potato."  *See* Trial Transcript (2/22/2017) pg. 31 [DE # 31].

[72] *See* Debtor Exhibit A.  To be clear, Fort Apache also asked, in the alternative, for monetary damages against Huddleston Exploration.  *Id.*

[73] *See* Debtor Exhibits B & C.

[74] *See* Debtor Exhibit G.

[75] *See* Trial Transcript (2/22/2017) pg. 29 [DE # 31].

31.     Both Mr. Huddleston and Huddleston Exploration filed chapter 7 bankruptcy cases on April 8, 2016.  Fort Apache has filed proofs of claim in both bankruptcy cases.[76]  However, this Adversary Proceeding, filed by Fort Apache on September 16, 2016, addresses only the dischargeability of the debt that Mr. Huddleston  personally owes to Fort Apache.[77]

## II.     CONCLUSIONS OF LAW

1.     Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This is a statutory core proceeding, pursuant to 28 U.S.C. §157(b)(2)(B) and (I); thus, the bankruptcy court has statutory authority to enter a final order.  Moreover, the court has determined that it has Constitutional authority to enter a final order in this matter.  Finally, venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     Fort Apache has brought claims against Mr. Huddleston under section 523(a)(2)(A) and section 523(a)(6) of the Bankruptcy Code.  The standard of proof in any action under section 523(a) of the Bankruptcy Code is preponderance of the evidence.[78]  Preliminarily, the court does not believe that a "willful and malicious injury" has been shown to have occurred in the case at bar by a preponderance of the evidence.

3.     However, section 523(a)(2)(A) is an altogether different matter.  The court does conclude that there were "false pretenses," "false representations," and an "actual fraud" committed by Mr. Huddleston against Fort Apache that gives rise to a nondischargeable debt, pursuant to section 523(a)(2)(A) of the Bankruptcy Code.  "Section 523(a)(2)(A) is not designed

---

[76] *See* Claim No. 22-1 for $2,233,548.64 in Case No. 16-31488 (Mr. Huddleston's Bankruptcy Case).  *See also* Claim No. 13-1, Claim for $2,233,548.64 in Case No. 16-31490 (Huddleston Exploration, LLC's Bankruptcy Case).

[77] The court understands that the parties have agreed that Mr. Huddleston and Huddleston Exploration have reserved their rights to still assert their counterclaims against Fort Apache in the form of a possible setoff to Fort Apache's claim allowed herein.

[78] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

to protect debtors; rather it is designed to protect the victims of fraud."[79]  That being said, even in the section 523(a)(2)(A) context, "[e]xceptions to discharge are strictly construed against the creditor and liberally construed in favor of the debtor."[80]

4.      Section 523(a)(2)(A) of the Bankruptcy Code provides that:

A discharge under section 727 ... of this title does not discharge *an individual debtor from any debt* for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by *false pretenses*, *a false representation*, or *actual fraud*, other than a statement respecting the debtor's or an insider's financial condition.[81]

5.      Here, Fort Apache has argued that Mr. Huddleston made "false representations" to it many times along the way (*e.g.,* he had not raised investor money yet to fulfill Huddleston Exploration's obligations under the JOA and PA but he was working on it and he would).  Fort Apache has also argued that Mr. Huddleston's actions amounted to "actual fraud."  Before determining whether section 523(a)(2)(A) applies here, the court must first determine: (1) what is the actual "*debt*" here; and (2) who is obligated on such *debt*.  After determining the "what" and "who" of the debt, the court can then examine whether such debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

### A.  The "What" and "Who" of the Debt Owed to Fort Apache.

6.      Preliminarily, Fort Apache filed a proof of claim against Mr. Huddleston in the amount of $2,233,548.64 for amounts owed under the JOA.[82]  At the trial, Fort Apache asserted

---

[79] *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314, 319 (5th Cir. 2005).

[80] *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)).

[81] 11 U.S.C. § 523(a)(2)(A) (2016).

[82] A largely identical proof of claim was also filed in the Huddleston Exploration bankruptcy proceeding.  *See* Claim No. 13-1, Claim for $2,233,548.64 in Case No. 16-31490 (Huddleston Exploration LLC's Bankruptcy Case).

actual damages against Mr. Huddleston in the amount of $1,861,220.27.[83] The damages calculation presented at the trial is derived from amounts owed under the JOA, based upon Huddleston Exploration's renegotiated agreement (in June 2014) to fund amounts necessary to maintain a 65% working interest in the Well (totalling $2,061,847.56). Fort Apache deducted from this amount $200,627.49, for the net operating distribution to which Huddleston Exploration would have been entitled for its 65% working interest (up through the time of trial). The potential problem with this damages calculation is that the JOA and PA were executed by *Huddleston Exploration*, not by Mr. Huddleston personally. In fact, it was not until June 2014, that Mr. Huddleston became himself contractually liable on a debt to Fort Apache—and this was only for the specific amount of $1.4 million (an agreed amount that Fort Apache needed to be paid quickly to apply toward Huddleston Exploration's obligations at a 65% working interest level).[84] Despite these facts, Fort Apache has argued that Mr. Huddleston is personally liable for the entire net indebtedness owed by Huddleston Exploration under the JOA and PA for a 65% working interest—not just the $1.4 million Mr. Huddleston contractually agreed to pay under the June 2014 Agreement. This would be a $461,220.27 additional debt (the $1,861,220.27 net indebtedness, minus $1,400,000). What is the legal theory argued for this?

7.      In its Amended Complaint, Fort Apache has requested that this court "pierce the corporate veil." "Piercing the corporate veil" has traditionally been employed to hold a *shareholder* liable for a *corporation's* debt or obligation under certain circumstances. Here, Fort Apache has urged the court to apply the same concept to an LLC and essentially pierce the corporate veil of Huddleston Exploration to hold its sole managing member, Mr. Huddleston,

---

[83] *See* Plaintiff's Exhibit 35.

[84] *See* Fort Apache Exhibit 13.

personally liable for **all** amounts owed to Fort Apache by Huddleston Exploration under the JOA. Huddleston Exploration is a limited liability company organized and existing under the laws of the state of Nevada,[85] so the court must look to Nevada law (not Texas Law) to determine whether or not veil piercing is permissible.[86]

8.    First, Nevada statutory law provides, "[u]nless otherwise provided in the articles of organization or an agreement signed by the member or manager to be charged, no member or manager of any limited-liability company formed under the laws of this state is individually liable for the debts or liabilities of the company."[87]  While the statute clearly limits a member's liability to the LLC unless otherwise provided for in the articles of organization or an agreement signed by the member or manager charged,[88] courts, in applying Nevada law, have nonetheless extended the corporate veil piercing/alter ego concept[89] (as codified in Nev. Rev. Stat. § 78.747) to LLCs, recognizing that the varieties of fraud and injustice such doctrine was designed to redress can be equally exploited through limited liability companies.[90]  Moreover, in determining whether members should be personally liable for the debts of an LLC, Nevada courts have employed a three-part test, which is stated in Nev. Rev. Stat. § 78.747:

---

[85] *See* Debtor Exhibit A.

[86] The analysis for a Texas LLC would no doubt be different, as Texas has a different applicable statute.  The result reached here may or may not have been the same under Texas law.

[87] Nev. Rev. Stat. § 86.371 (West, Westlaw through 2016).

[88] There was no evidence presented at trial regarding this fact.

[89] It is important to note that while Nevada courts use the term "alter ego" versus "veil piercing," the court believes that such identifiers are essentially communicating the same principle under Nevada law, namely that one must pierce the corporate/LLC veil to access the alter ego of the shareholder/member.

[90] *See AE Rest. Assocs., LLC v. Giampietro (In re Giampietro)*, 317 B.R. 841, 846 (Bankr. D. Nev. 2004).  *See also Montgomery v. eTreppid Techs., LLC*, 548 F. Supp. 115, 1183 (D. Nev. 2008) (Federal and state courts have consistently applied the law of corporations to LLCs, including for the purposes of piercing the corporate veil).

1. Except as otherwise provided by specific statute, no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation.

2. A stockholder, director or officer acts as the alter ego of a corporation if:

    *(a) The corporation is influenced and governed by the stockholder, director or officer;*

    *(b) There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and*

    *(c) Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice*.

3. The question of whether a stockholder, director or officer acts as the alter ego of a corporation must be determined by the court as a matter of law.[91]

9.      This three-part test was initially set forth by the Nevada Supreme Court[92] and was later codified by the Nevada legislature in 2001. It is insufficient to merely establish that an individual meets the first two requirements, control and unity of interest, which are commonly found "in small, closely held corporations involving a single or small group of stockholders, directors or officers."[93] A plaintiff attempting to pierce the corporate veil in Nevada must additionally show "that the financial setup of the corporation is only a sham and caused an injustice."[94] In other words, when applying the corporate veil piercing, alter ego test to an LLC, it seems that a court should give more weight to the third requirement, as the first two requirements are very common with LLCs.[95]

---

[91] Nev. Rev. Stat. § 78.747 (West, Westlaw through 2016).

[92] *See Frank McCleary Cattle Co. v. Sewell*, 317 P.2d 957, 959 (Nev. 1957), *overruled on other grounds by Callie v. Bowling*, 160 P.3d 878 (2007).

[93] William H. Stoddard, Jr., *Making Sense of Nevada's Alter Ego Doctrine*, 20-Dec Nev. Law. 6, 7 (Dec. 2012).

[94] *N. Arlington Med. Bldg., Inc. v. Sanchez Const. Co.*, 471 P.2d 240, 244 (Nev. 1970) (finding the alter ego test was not satisfied when a corporate president had control over a closely-held corporation and undercapitalized it, because there was no "causal connection" between these factors and the corporation's inability to repay a promissory note); *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 846-48 (Nev. 2000) (finding the alter ego test satisfied when the defendant took advantage of corporate structures to avoid paying a judgment against him).

[95] *Giampietro*, 317 B.R. at fn. 10.

10.     Looking at the first requirement, that the "corporation is influenced and governed by the stockholder, director or officer," the court believes that such requirement has clearly been met in this case.  Mr. Huddleston was the sole member and manager of Huddleston Exploration and controlled the decision-making process of Huddleston Exploration.  In fact, there was no evidence that anyone other than Mr. Huddleston served in a decision-making role or had control over Huddleston Exploration.  As such, the first requirement is easily satisfied.

11.     As to the second requirement, that "there is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other," the court also believes that such requirement has been met.  In determining whether this second requirement applies, a court should look to such factors as commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities.[96]  The evidence presented at trial emphatically demonstrated that almost all of these occurred in this case.  Specifically, the evidence showed commingling of Huddleston Exploration's bank accounts with Mr. Huddleston's, diversion of investor funds meant for Fort Apache to Mr. Huddleston personally, treatment of investor funds for the Well as Mr. Huddleston's own funds, and a failure to recognize Huddleston Exploration as a separate business entity.[97]  Accordingly, the second requirement is also easily met.

12.     Finally, as to the third (and arguably most important) requirement, that "adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice," the Nevada Supreme Court has stated that '[i]t is not necessary that the plaintiff prove actual fraud.

---

[96] *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 887 (Nev. 1987).

[97] *See, e.g.*, Fort Apache Exhibit 34.

It is enough if the recognition of the two entities as separate would result in an injustice.'"[98] However, there must be a causal connection between those factors and the plaintiff's injury.[99] By way of example, in *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 823 (1977), while finding that a parent and subsidiary corporation had identical officers and shareholders, and that the corporation was undercapitalized at the time of trial, the court observed that "it is not reasonable to conclude that the [parent corporation] undercapitalized [the subsidiary corporation] in order to frustrate the payment of its obligation" to plaintiff and that, while other factors supported a finding of alter ego liability, there was no causal connection between those factors and the injury suffered by plaintiff, such that the third factor was not met.[100] Conversely, in *Mosa v. Wilson-Bates Furniture Co.*, 583 P.2d 453, 454-55 (1978), the court found that it was appropriate to pierce the corporate veil where the shareholder had given "personal assurances at various times that he ... would personally pay the outstanding debts of [the corporation]," and that such assurances were given "to induce forbearance by [plaintiff] in asserting its claim against the corporation for debts due and owing."

13.     The court ultimately believes that the third requirement has been met in this case. Specifically, the court believes that adherence to the corporate fiction with regard to Huddleston Exploration would sanction fraud and promote a manifest injustice. This court heard evidence of

---

[98] *Frank McCleary Cattle*, 317 P.2d at 959 (Nev. 1957) (citing to *Gordon v. Aztec Brewing Co.*, 203 P.2d 522, 527 (Cal. 1949) (fraud or injustice requirement satisfied when "confusion would be promoted and an unjust result be accomplished if the maintenance of the two entities controlled by the same persons and having an identical name were permitted to frustrate a meritorious claim.")); *Wilson v. Stearns*, 267 P.2d 59, 69 (Cal. Dist. Ct. App. 1954) ("Where it appears that a corporation is being used merely as an instrumentality through which an individual who is the owner of its capital stock transacts his business, and where an inequitable result would ensure, the two should be considered as one ....The injustice here manifest [sic ] is that to recognize respondent George Steams and Alamo Development Co., Inc., as two separate and distinct entities would permit the former to avoid his liability on a contract through use of the corporate fiction for that purpose.").

[99] William H. Stoddard, Jr., *Making Sense of Nevada's Alter Ego Doctrine*, 20-Dec Nev. Law. 6, 7-8 (Dec. 2012).

[100] *See also N. Arlington Med. Bldg., Inc., v. Sanchez Constr. Co.*, 471 P.2d 240, 244 (1970) (where a corporate president, who had completely influenced and managed the corporation failed to follow corporate formalities and left the corporation undercapitalized, court nevertheless held that the plaintiff "failed to show any causal connection" between the way the corporation was capitalized and its subsequent inability to pay the obligation owed).

how Mr. Huddleston used the operating accounts of Huddleston Exploration as his personal piggy bank (*i.e.*, how he used investor funds that should have been sent to Fort Apache to gamble at casinos and for other personal expenses). Moreover, the court concludes that there is the necessary ***causal connection*** between the alter ego factors and Fort Apache's injury (similar to the connection discussed in *Mosa* above) because, at the same time Mr. Huddleston was using investor funds for his own personal use (instead of sending them to Fort Apache), he was telling Fort Apache to continue moving forward with the Well project (including moving the rig to the Well site) and assuring Fort Apache that he would be able to come up with the funds needed to cover his portion of the Well expenses. Allowing Mr. Huddleston to now use the existence of the LLC as a shield would no doubt promote a manifest injustice. Thus, the court believes that the third requirement has also been met.

14. Having found that the three-part test as set forth by the Nevada Supreme Court and as provided for in Nev. Rev. Stat. § 78.747 has been satisfied, the court finds that it should pierce the veil of Huddleston Exploration and hold Mr. Huddleston personally liable for the ***entire debt owed by Huddleston Exploration to Fort Apache*** under the JOA (*i.e.,* $1,861,220.27—not merely the $1.4 million he contractually guaranteed).

### B. Is the Debt Owed by Mr. Huddleston Nondischargeable?

15. Having now found that Mr. Huddleston is personally liable to Fort Apache for the $1,861,220.27 owed under the JOA (not just the $1.4 million Mr. Huddleston agreed to be personally liable for, pursuant to the June 2014 Agreement), the court must now determine whether such debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code. Specifically, Fort Apache has argued that the debt is nondischargeable based upon both "false representations" and "actual fraud."

16.     First, in order to prove that a debt is nondischargeable, because money was obtained through "*a false representation,*" pursuant to section 523(a)(2)(A), a creditor must show that: (1) the debtor made representations other than a statement concerning his financial condition, (2) at the time the debtor made the representations, he knew they were false, (3) the debtor made the representations with the intention and purpose to deceive the creditor, (4) the creditor justifiably relied on such representations,[101] and (5) the creditor sustained losses as a proximate result of the false representations.[102]   "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required."[103]   Moreover, misrepresentations may also be made through conduct.[104]   However, "[d]ebts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud 'involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'"[105]   An intent to deceive may be inferred from a "reckless disregard for the truth or falsity of the statement combined with sheer magnitude of the resultant misrepresentation."[106]   Nevertheless, an honest

---

[101] In evaluating a cause of action under section 523(a)(2)(A) of the Bankruptcy Code, the court must determine that the plaintiff justifiably relied upon the representations made by the defendant. *Mullen v. Jones (In re Jones)*, 445 B.R. 677, 721 (Bankr. N.D. Tex. 2011) (citing to *Field v. Mans*, 516 U.S. 59, 74–75 (1995)). Justifiable reliance does not require independent investigation of the facts as presented, but a plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he used his sense to make a cursory examination. *Jones*, 445 B.R. at 721 (citing to *Field*, 516 U.S. at 69–71). Justifiable reliance is not a "reasonable man" standard, but is a lesser standard than reasonable reliance (which is a statutory element of section 523(a)(2)(B) of the Bankruptcy Code). *Jones*, 445 B.R. at 721 (citing to *Field*, 516 U.S. at 77).

[102] *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

[103] *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001).

[104] *Id.*

[105] *Provident Bank v. Merrick (In re Merrick)*, 347 B.R. 182, 186 (Bankr. M.D. La. 2006) (citing *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)).

[106] *Acosta*, 406 F.3d at 372.

belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive.[107]

17. Second, to the extent the court concludes that "false representations" were not made by Mr. Huddleston, Fort Apache has also argued that its debt may, nonetheless, be nondischargeable under the "actual fraud" prong of section 523(a)(2)(A). Recently, in *Husky International Electronics, Inc.*, the United States Supreme Court stated that, to the extent "***actual fraud***" is alleged, such term does not require an actual misrepresentation on the part of the wrongdoer—specifically the term is broad enough to incorporate a fraudulent conveyance scheme.[108] In reaching this conclusion, the Supreme Court relied on historical understandings of "actual fraud" in the bankruptcy context.[109] The Supreme Court "remand[ed] the case for further proceedings to determine whether an "actual fraud" had occurred.

18. Finally, while Fort Apache has argued that a "fraudulent representation" or "actual fraud" has occurred here, the court also believes that the "false pretenses" category under section

---

[107] *Id.*

[108] *Husky Int'l Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1586-87 (2016). In *Husky*, a creditor, Husky Electronics, Inc. ("Husky Electronics"), sold $164,000 of electronic parts to Chrysalis Manufacturing Corp. ("Chrysalis"). Chrysalis was 30% owned by one of its directors, Mr. Ritz ("Ritz"). During the time that Chrysalis was incurring debt to Husky Electronics, Ritz caused Chrysalis to transfer large monetary sums to entities that Ritz owned in whole or in part. Husky Electronics eventually filed a lawsuit against Ritz, seeking to hold him personally responsible for Chrysalis' $163,999.38 debt. Husky Electronics argued that Ritz' intercompany-transfer scheme was "actual fraud" for purposes of a Texas law that allows creditors to hold shareholders responsible for corporate debt. After the lawsuit was filed, Ritz filed a Chapter 7 bankruptcy case and Husky Electronics then initiated an adversarial proceeding therein, again seeking to hold Ritz personally liable for Chrysalis' debt. Husky Electronics also contended that Ritz could not discharge that debt in bankruptcy because the same intercompany-transfer scheme constituted "actual fraud" under section 523(a)(2)(A). The district court held that Ritz was personally liable for the debt under Texas law, but that the debt was not "obtained by ... actual fraud" as contemplated by § 523(a)(2)(A) and could be discharged in his bankruptcy. On appeal before the Fifth Circuit, Husky Electronics argued that Ritz' asset-transfer scheme was effectuated through a series of fraudulent conveyances—or transfers intended to obstruct the collection of debt—and argued that such transfers are a recognizable form of "actual fraud." While the Fifth Circuit disagreed, holding that a necessary element of "actual fraud" is a ***misrepresentation*** by the debtor to the creditor, the Supreme Court ultimately reversed the Fifth Circuit, holding that "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."

[109] *Id.* at 1586–87.

523(a)(2)(A) of the Bankruptcy Code may be relevant. Often times, courts use the terms "fraudulent representation" and "false pretense" interchangeably. However, the Supreme Court in *Husky* clearly recognized a distinction between the various types of fraud set forth in section 523(a)(2)(A) (namely "false representations" and "actual fraud"), and several courts have clearly recognized a distinction between a "false representation" and a "false pretense." For purposes of interpreting section 523(a)(2)(A) of the Bankruptcy Code, courts have generally defined "false pretenses" as written or oral misrepresentations, or conduct which creates or fosters in the proposed lender or creditor a "false impression" and can include "conduct and material omission."[110] "False pretenses" can also be defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."[111]

19. Looking to the evidence presented, the court ultimately concludes that the debt owed to Fort Apache fits under all three categories of fraud, and that the $1,861,220.27 owed by Mr. Huddleston to Fort Apache should be deemed nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code. First, the court concludes that Mr. Huddleston repeatedly made misrepresentations to Fort Apache regarding Huddleston Exploration's intent to honor its payment obligations and that it needed more time to raise sufficient funds—when, in fact, Huddleston Exploration had raised sufficient funds to meet its obligations and, instead of forwarding the funds to Fort Apache, Mr. Huddleston spent the funds on personal items, including hundreds of thousands of dollars for gambling. Fort Apache justifiably relied on Mr. Huddleston

---

[110] *See, e.g., Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (10th Cir. 2013) (citing to *Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007)).

[111] *Sturgeon*, 496 B.R. at 222 (citing *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006)).

to its detriment, by delaying the drilling of the Well and then ultimately bearing the costs for drilling and completion—having been reasonably convinced that funds would be imminently forthcoming. As noted earlier, an intent to deceive may be inferred from a "reckless disregard for the truth or falsity of the statement combined with sheer magnitude of the resultant misrepresentation."[112] This court easily infers an intent to deceive from Mr. Huddleston's reckless disregard for the falsity of his statements—when he repeatedly represented to Fort Apache that he had not raised the necessary investor funds, all the while knowing that he had raised the funds, then spent them on gambling. Second, the court also concludes that the facts of this case fit under the "false pretenses" provision of section 523(a)(2)(A). Here, the evidence demonstrated that Mr. Huddleston was repeatedly creating a false impression of the true facts, by telling Fort Apache that he needed more time to raise funds, when, in fact, such funds had already been raised. This false impression is what induced Fort Apache to repeatedly extend the time by which Mr. Huddleston had to pay Fort Apache and also induced it to itself bear costs for drilling and completion. Mr. Bloxsom credibly testified that, had he known that Mr. Huddleston was lying and diverting investor funds to use for his own personal desires, he would have terminated the deal. Finally, the court concludes, consistent with *Husky*, that Mr. Huddleston perpetuated a fraudulent scheme by transferring investor funds from Huddleston Exploration to himself and spending them on personal expenses with the intent of defrauding Fort Apache as a creditor. Accordingly, the court finds that the $1,861,220.27 debt owed to Fort Apache is nondischargaeble under section 523(a)(2)(A) of the Bankruptcy Code.[113]

---

[112] *Acosta*, 406 F.3d at 372.

[113] While not specifically pleaded by Mr. Huddleston in either his Original Answer or his Amended Answer, Mr. Huddleston argued at the trial that Fort Apache was not entitled to pursue actual monetary damages against him based upon the defense of "election of remedies" and pursuant to section K of the JOA entitled "Remedies of Operator Upon Default in Payment By Non-Operator." *See* Trial Transcript (2/22/2017) pgs. 146-49 [DE # 31] & Fort Apache Exhibit 4. Specifically, section K of the JOA provides the Operator (*i.e.*, Fort Apache) three remedies upon the default of a

20.     Finally, Fort Apache has requested reasonable attorney's fees spent in collecting delinquent amounts owed under the JOA and the parties' other agreements, proof of which it offered to submit before entry of a final judgment in the form of a fee application.  Presumably, Fort Apache desires for any award of attorney's fees to also be nondischargeable, pursuant to section 523 of the Bankruptcy Code.   Under the "American Rule," each party to litigation pays its own fees arising out of litigation, unless a fee-shifting provision exists pursuant to statute or

---

Non-Operator (*i.e.*, Huddleston Exploration): (i.) Operator may treat the amount of the unpaid invoice as a valid obligation, and collect the same (subject to final adjustment in the case of invoices for estimates) in any legal matter; (ii.) Operator may elect to treat such failure to pay such costs and expenses in a timely manner as a non-consent under the provisions of Article VI.B.2 with respect to the wells as to which the default has occurred, with the result that the non-consent penalties established in such provision or in Article XV.N, hereof, as applicable, shall be in effect with respect to the interest of the non-defaulting non-operator in such well; (iii.) Operator may require the defaulting Non-Operator to surrender to Operator, without warranty to title, either expressed or implied, and free of any liens and encumbrances granted or permitted by the defaulting Non-Operator, all of the right, title and interest of the defaulting Non-Operator in and to the leases.  *See* Fort Apache Exhibit 4.  Thus, section (i.) permits the Operator to pursue monetary damages against a defaulting Non-Operator and section (iii.) permits the Operator to seek forfeiture of the Non-Operator's interest in the Well.  Section K of the JOA goes on to state that "For purposes of this Operating Agreement, however, Operator shall not be deemed to have elected the remedy provided in subsection (i.) of this article until Operator shall have obtained from a court of competent jurisdiction a final and non-appealable judgment against the defaulting Non-Operator for the full amount of the unpaid invoice. The election by Operator of the remedy provided in subsection (i.) shall preclude Operator's pursuit of the remedies provided in subsections (ii.) and (iii.), but otherwise shall not restrict, limit, or preclude Operator's recourse against the defaulting Non-Operator under any other provision of this Operating Agreement or otherwise for the defaulting Non-Operator's breach of its obligations hereunder and any resulting damage to Operator.  Moreover, section K of the JOA also provides that the Operator's election under either subsection (ii) or (iii) shall be deemed to constitute an election of remedies by the Operator under the terms of the JOA, at law, or in equity with respect to such breach and any resulting damages to Operator; provided that if a court of competent jurisdiction holds such election to be ineffective or refuses to enforce such election, then Operator shall be deemed to have available all other remedies.  Here, Mr. Huddleston has argued that because Fort Apache originally sought forfeiture of Huddleston Exploration's interest in the Well in the State Court Petition pursuant to section (iii.), it could not now "change course" in this Adversary Proceeding and seek monetary damages instead.  The court finds that such defense ultimately fails.  Specifically, the State Court Petition originally provided that the "Plaintiff seeks monetary relief over $200,000, but not more than $1,000,000 and non-monetary relief . . . *Alternatively*, Plaintiff seeks monetary relief over $1,000,000, should the non-monetary relief sought herein be denied by the Court."  *See* Debtor Exhibit A (emphasis added).  In other words, Fort Apache appeared to preliminarily argue for forfeiture of Huddleston Exploration's interest in the Well and then argued, in the alternative, for monetary damages in the state court, and such approach appears entirely consistent with the specific language of section K of the JOA.  However, what Fort Apache argued in the state court does not really matter here, because nothing was ever decided in the State Court, as Mr. Huddleston filed bankruptcy before Fort Apache's claims could be actually adjudicated and reduced to a judgment.  The filing of this Adversary Proceeding gave Fort Apache a clean slate, as this court would not only be liquidating the amount of Fort Apache's claim, but it would also be determining whether or not it could be discharged.  This permitted Fort Apache to pursue any of its remedies under section K of the JOA, even though it may have originally requested "forfeiture" in the state court.  Accordingly, the court finds that Mr. Huddleston's "Election of Remedies" defense with respect to what was plead in the State Court Petition does not apply in this Adversary Proceeding and that this defense ultimately fails.

contract.[114]  Since the Bankruptcy Code does not address whether creditors can recover attorney's fees in nondischargeability actions, creditors can only recover them if allowed by another statute or by contract.  The issue is not always simple.[115]  Thus, the court will grant Fort Apache thirty (30) days after entry of these Findings of Fact and Conclusions of Law to file a fee application setting forth their reasonable attorney's fees sought, ***along with post-trial briefing setting forth the contract or statutory provisions upon which they rely (along with supporting case law)*** to establish a nondischargeable debt for attorney's fees.  Mr. Huddleston shall have fourteen (14) days from the date that the fee application and briefing is filed to file any objections and oppositional briefing.  The court will thereafter issue supplemental findings and conclusions on this discrete issue.

21.     After a ruling by this court on the amount of nondischargeable attorney's fees (if any) owed to Fort Apache, Fort Apache shall upload a final judgment consistent herewith.

### ###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###

---

[114] *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 263 (1975); *Key Tronic Corp. v. United States,* 511 U.S. 809, 819 (1994); *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 311 (Tex. 2006).

[115] *See, e.g., Schwertner Backhoe Servs., Inc. v. Kirk (In re Kirk),* 525 B.R. 325, 330-336 (Bankr. W.D. Tex. 2015).